2007 UT 33

**In the matter of the ADOPTION OF CONNOR, a child under 18 years 20060582 of age.**

**Raymond J. Barnes and James and Christie Solomon, Appellants.**

Nos. 20060581, 20060582.

Supreme Court of Utah.

April 13, 2007.

Cory R. Wall, Salt Lake City, for Raymond Barnes.

Ronald D. Wilkinson, Orem, for James Solomon and Christie Solomon.

Martha Pierce, Felipe E. Rivera, Guardians ad Litem, Salt Lake City.

On Certification from the Utah
Court of Appeals.

WILKINS, Associate Chief Justice:

¶ 1 We are asked to review the decision of the Third District Juvenile Court that Raymond Barnes, an unmarried biological father, had standing to contest the adoption of his son by James and Christie Solomon. We also review the court's order awarding joint legal custody and primary physical custody to the Solomons. We resolve these two separate appeals with a single opinion. We affirm that Mr. Barnes has standing, and we reverse the custody order as contrary to law.

## BACKGROUND

¶ 2 Connor was about eighteen months of age at the time his biological mother placed him for adoption and relinquished her parental rights. James and Christie Solomon, with whom Connor was placed, took him into their home and petitioned for adoption in the Third District Juvenile Court. As required, the Solomons also sought to terminate any claim of parental rights by Connor's father.

Connor's unmarried biological father, Raymond Barnes, sought to intervene in the proceedings.

¶ 3 The juvenile court was first required to determine whether Mr. Barnes had legal standing to contest the petition for adoption under Utah Code section 78–30–4.14. Due to incarceration, Mr. Barnes had been separated from Connor for much of the child's first eighteen months of life. However, the juvenile court found that, although he did not make cash payments to the birth mother, Mr. Barnes did purchase some necessary items for the child, including clothing, food, diapers, and toys. The juvenile court also noted that when he was incarcerated, Mr. Barnes' family "made sure" that Connor's mother had what she needed to care for the child and, at times, took Connor into their home and cared for him themselves.

¶ 4 The court also found that Connor lived with Mr. Barnes for at least four months prior to placement for adoption and that, during that time, Mr. Barnes and his family provided for Connor's full support. When Mr. Barnes was not incarcerated, he had regular visits with Connor. When he was incarcerated, Mr. Barnes maintained regular communication with and about Connor through phone calls.

¶ 5 The court concluded that Mr. Barnes had standing to contest the adoption because, as an unmarried biological father, he had complied with the provisions of Utah Code section 78–30–4.14. As a consequence, the juvenile court dismissed the adoption petition, as mandated by statute, and convened a custody hearing pursuant to Utah Code section 78–30–4.16. The court awarded joint legal custody of Connor to Mr. Barnes and the Solomons, giving the Solomons primary physical custody and Mr. Barnes standard visitation rights.

¶ 6 On appeal, the Solomons seek reversal of the juvenile court's determination that Mr. Barnes had standing to contest the adoption. Mr. Barnes challenges the legal validity of the custody order in a separate appeal. We have consolidated the appeals for review and decision.

## ANALYSIS

¶ 7 We address separately the legal analysis of standing and custody. Without standing to challenge the adoption proceeding, Mr. Barnes would have no interest in the custody order. In fact, no such order would likely be required, as the adoption would appear to have been otherwise unobjectionable, and Mr. Barnes' rights as a father would have been terminated. On the other hand, since we conclude that the juvenile court was correct in regard to standing, it becomes necessary to consider the appropriate legal limits to the custody arrangement imposed by the court.

## I. STANDING

■ ¶ 8 Utah Code section 78–30–4.14 states that, "with regard to a child who is placed with adoptive parents more than six months after birth, consent of an unmarried biological father is not required unless the unmarried biological father" meets three requirements.[1] In order to have standing to contest the adoption, Mr. Barnes was required to establish that he had (1) "developed a substantial relationship with the child," (2) "[taken] some measure of responsibility for the child and the child's future," *and* (3) "demonstrated a full commitment to the responsibilities of parenthood by financial support of the child of a fair and reasonable sum in accordance with [his] ability."[2]

¶ 9 The juvenile court found that Mr. Barnes had developed a substantial relationship with Connor. An unmarried biological father can establish that he has developed a substantial relationship with a child through either of two means: first, by visiting the child at least monthly, unless physically or financially unable to do so; or second, by engaging in regular communication with the child or an authorized agent of that child.[3] In the judgment of the juvenile court, Mr.

Barnes satisfied both of these requirements. When he was not incarcerated, Mr. Barnes regularly visited Connor. In fact, the child often stayed with Mr. Barnes for days or weeks at a time prior to placement for adoption. At one point, Connor lived with Mr. Barnes for four months, and during that time Mr. Barnes provided for Connor's necessary care. When he was incarcerated, and thus unable to visit personally, Mr. Barnes made regular phone calls to Connor or to Connor's custodian. As found by the juvenile court, Mr. Barnes' conduct satisfied the first requirement.

¶ 10 The second element requires establishing that the unmarried biological father "took some measure of responsibility for the child and the child's future."[4] The juvenile court found that Mr. Barnes also satisfied this requirement. When Connor was with Mr. Barnes, Barnes cared for him. That care included purchasing clothing, formula, and diapers for the child. When Mr. Barnes was incarcerated, his father cared for Connor and provided for his needs on Barnes' behalf. Accordingly, Mr. Barnes took "some measure of responsibility" for Connor, in satisfaction of the second statutory element.

¶ 11 Finally, an unmarried biological father must demonstrate a "full commitment to the responsibilities of parenthood by financial support of the child of a fair and reasonable sum in accordance with the father's ability."[5] This requirement presents perhaps the greatest hurdle in this unmarried biological father's path to standing.

¶ 12 Certain minimum factual findings are important for a meaningful review of an unmarried biological father's degree of financial support. The factual issues most valuable in this assessment normally would include evaluations of the father's ability to provide support during the entire relevant time period and what support he actually provided. The relevant time period is from conception to

---

1. Utah Code Ann. § 78–30–4.14(4) (Supp.2006). While we rely on the law in force at the time of the hearing, we note that this statute was amended in 2006, after the petition for adoption was filed. However, the requirements to establish standing have not been changed. Accordingly, throughout this opinion, we cite to the current version of the statute.

2. *Id.* § 78–30–4.14(4)(a)(i)–(iii).

3. *Id.* § 78–30–4.14(4)(a)(i)(A), (B).

4. *Id.* § 78–30–4.14(4)(a)(ii).

5. *Id.* § 78–30–4.14(4)(a)(iii).

placement for adoption. Also, it is important to review the support provided from other sources during the relevant period and the support the child required compared with the support the child received. With these facts in hand, it becomes an easier task for the court to determine whether, under the circumstances of this child's life, the support provided by the unmarried biological father amounts to a fair and reasonable sum, as required by law. In reaching this conclusion, the trial court may consider additional factors that aid in the determination, including in some cases the ability of the father to determine and supply pre- and post-birth support. Active concealment by the biological mother may partially compromise an unmarried biological father's ability to identify needs. However, once discovered, the concealment does not excuse the effort to provide support.

¶ 13 The findings of the juvenile court in this instance do not clearly illuminate, for our review, many of these important facts. For example, we do not know what Mr. Barnes' capacity to provide for Connor was during the mother's pregnancy and the eighteen months that followed. There is testimony in the record that Mr. Barnes made around twenty dollars per hour when able to work. However, there is no indication of how much he actually made during the relevant period and when he was not incarcerated. We also do not have a clear picture of which of Connor's needs were actually met by Mr. Barnes during the brief time he lived with Connor's mother. We know that during part of the pregnancy, Mr. Barnes lived with the birth mother. We do not know, however, what the financial arrangements were between the couple at that time and what, if any, financial contributions Mr. Barnes made.

¶ 14 Moreover, financial support is not limited to cash payments made by the father to the mother or the child's custodian. Shelter, food, clothing, and education, whether they are provided by the father himself or by the father's family at his request, all count as contributions. The juvenile court found these to be contributions Mr. Barnes clearly made at times. However, it is unclear what, if any, support was offered during the pregnancy or at the time of birth.

¶ 15 Given this relative dearth of factual findings, it is difficult for us to evaluate the juvenile court's conclusion that Mr. Barnes had strictly complied with the requirements of Utah Code section 78–30–4.14. However, notwithstanding the omissions of specific factual findings on some of these important issues, the omissions in the findings themselves are not fatal unless they are effectively challenged by one of the opposing parties in some meaningful manner. This challenge becomes essentially one of sufficiency of the evidence.

¶ 16 When faced with questions about proceedings in the trial court that are not adequately challenged on appeal, we apply a presumption of regularity.[6] Unless an opponent on appeal meets the burden of demonstrating the failure of the evidence to support the action taken by the trial court, we assume the evidence and process employed were sufficient.[7] To mount a meaningful challenge to the factual findings of a trial court, the challenging party must accumulate all of the supportive evidence and convince us that the factual findings relied upon by the trial court are clearly erroneous based upon the most supportive interpretation of the evidence.[8] The Solomons fail to mount such a challenge.

¶ 17 We grant trial courts broad discretion within the statutory framework to determine if certain behavior complies with statutory requirements. The statute in question asked the juvenile court to determine whether Mr. Barnes had provided "financial support of [Connor] of a *fair and reasonable sum* [and] *in accordance with [his] ability.*"[9] This illustrates the factual balancing the trial court must engage in and shows just how factually sensitive the court's ultimate legal

6. *State v. Robison,* 2006 UT 65, ¶ 21, 147 P.3d 448.

7. *Id.*

8. *Id.*

9. Utah Code Ann. § 78–30–4.14(4)(a)(ii) (emphasis added).

conclusions are. This type of fact-sensitive inquiry is exactly what the trial court is best suited for. Consequently, we are reluctant to substitute our own judgment for that of the trial court unless compelled by the law and facts to do so.

¶ 18 We defer, in this case, to the judgment of the trial court. The trial court acted within its grant of discretion when it concluded that Mr. Barnes had strictly complied with the requirements of Utah Code section 78–30–4.14 and that he therefore had standing to contest the adoption. Strict compliance does not require more than fully meeting each test imposed by the statute. Support of a "fair and reasonable sum" is established by reference to the facts of the individual case and turns in significant part on the overall balance applied by the trial court. We are not compelled to upset that balance here.

## II. CUSTODY ORDER

¶ 19 Once it concluded that Mr. Barnes had standing to contest the adoption, the juvenile court had no choice other than to dismiss the adoption petition pursuant to Utah Code section 78–30–4.14. The juvenile court then convened a custody hearing as required by Utah Code section 78–30–4.16. After an evidentiary hearing, the juvenile court order granted the Solomons permanent physical custody and, along with Mr. Barnes, joint legal custody.

¶ 20 Our recent decision in *A.N. v. M.I.W. (In re P.N.)*[10] controls. In a case very similar to this, we said, "Use of [Utah Code section 78–30–4.16] to award permanent custody through a best interest analysis, when such use would deprive fit parents of custody and visitation, would in all likelihood create constitutional problems...."[11] We concluded that section 78–30–4.16(2)(b) "cannot be used to give permanent custody of a child to legal strangers, which is what the [adoptive parents] became once the court dismissed their petition for adoption."[12]

¶ 21 In *P.N.*, we reviewed a failed adoption where the unmarried biological father was not willing to consent. We noted that the statute required the trial court to dismiss the adoption petition and to promptly hold a hearing to determine the temporary custody arrangements for the child.[13] The trial court was not at liberty to disregard the biological father's rights to custody of his child in favor of the failed-adoptive parents.[14] The biological father had not been determined to be an unfit parent, nor had his parental rights been terminated or diminished in any way.[15] The failed-adoptive parents, once the petition for adoption had been dismissed, became legal strangers to the child and could no longer claim any rights to custody, control, or other access to the child.[16]

¶ 22 The purpose of the custody hearing provided for in the adoption statute is to establish the immediate custody of the child for only so long as it may take to transition the legal custody back to the biological fit parent or parents. While the best interests of the child are important at this stage, they apply only so far as to inform the transition plans, not to circumvent them.

¶ 23 In the case before us, the juvenile court granted permanent physical custody to the Solomons, with joint legal custody and visitation rights to Mr. Barnes. This is not permissible. Absent a determination that Mr. Barnes is an unfit parent, he has a right to full legal and physical custody of Connor that is superior to the Solomons. With the status of failed-adoptive parents, the Solomons become legal strangers to Connor, and the trial court has no authority to vest in them anything other than the most transitory custody and guardianship of Connor. The court must arrange for Connor's return to his biological father with all due haste, subject only to those few significant concerns

10. 2006 UT 64, 148 P.3d 927.

11. *Id.* ¶ 14.

12. *Id.* ¶ 15.

13. *Id.* ¶ 13.

14. *Id.* ¶¶ 14–15.

15. *Id.* ¶ 8.

16. *Id.* ¶ 15.

that Connor make the transition with minimum harm.

¶ 24 As guidance to the juvenile court on remand, and to other courts facing the same question, we note that once an unmarried biological father has established standing to contest, and does in fact contest, an adoption, the level of bonding between child and anyone other than the biological parents becomes legally irrelevant. Unless the biological father is found to be unfit, and his parental rights terminated, his rights to the child are superior to anyone other than a contesting biological mother, with whom his rights may be equal.[17]

## CONCLUSION

¶ 25 Accordingly, we affirm the judgment of the juvenile court that the unmarried biological father had standing to contest the proposed adoption of Connor by the Solomons, and we vacate the juvenile court's order of joint legal custody. We remand to the juvenile court for an immediate hearing for the sole purpose of arranging the prompt and safe transition of Connor to the custody and control of his biological father.

¶ 26 In a situation such as this where the parties' love and concern for the child is unquestioned, but where their views of what is best for the child differ, we anticipate that counsel and trial courts will make every reasonable effort to dissuade parties from investing unwarranted time, emotion, and resources in further legal proceedings. While this approach is no doubt difficult for those good and anxious people seeking to adopt a child, and equally so for biological parents who find themselves in such a situation, it is of real value to no one, especially the child, to have the outcome prolonged when the policy of the law is clear and its application certain.

¶ 27 We anticipate that, in the future, every effort will be made to avoid delay in cases like this. Such efforts should include requests to the appellate courts for expedited appeal when appropriate. We also anticipate that counsel will stay fully abreast of the case law so they can properly advise their clients as to the best way to proceed.

¶ 28 This is a difficult and painful case for all. However, the law is clear, and the policy of the law as set by the legislature is clear. The result we announce today is required by the law. We encourage the Solomons and Mr. Barnes to pay special attention to the needs of this small child. This transition may be hardest for him, and his needs must come first.

¶ 29 Affirmed as to standing, vacated and remanded as to custody.

¶ 30 Chief Justice DURHAM, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice WILKINS' opinion.